The Fourth District Appellate Court of the State of Illinois has now convened. The Honorable John W. Turner presiding. Thank you. Good morning everyone. We're here on Yarborough as the administrator of the Estate of Jones v. City of Springfield. City of Springfield being the appellant in this please identify yourself for the record. Randall Meade for Drake Naropin Meade for the appellant. Thank you and for the appellee would you please state your name for the record. Todd Brezny for the estate your honor. Thank you. Mr. Meade you may proceed with your argument. Thank you. May it please the court and counsel. The primary question to be answered today is whether the record shows facts which justify sending the liability question to the jury. That is whether there is evidence sufficient to prove willful and want conduct in the manner in which the city operated its beach. And we argue that there is no such justification to allow that to go to the jury and that the trial court erred in denying our motion for judgment NOV. I think more fundamentally the question is whether the substantive law of immunity municipal tort immunity can be determined by the adverbs that a plaintiff chooses to use in her complaint. In 2007 Eric Jones then age 16 drowned at the Lake Springfield beach. It was owned and managed by the all of the allegations of the complaint had the adverb willfully and wantonly in front of the verb of alleged wrongdoing on the city's part. All the allegations really sounded in negligence and there are no claims that set out any sort of egregious conduct that would be worthy of being called willful and wanton at least as that as that term is self. Of course the the type of pleading is done because the state of Illinois enacted immunity statutes to partially immunize municipalities in tort cases like this one. The purpose is it's cited in the Van Meter case that I cited in my brief where the Supreme Court said the act the Immunity Act serves to protect local public entities and public employees from liability arising from the operation of government. By providing immunity the government the General Assembly sought to prevent the dissipation of public funds on damage awards in tort cases. So exactly the situation. Let me stop you there your argument seems to be proceeding along the lines as if the jury had not been instructed properly about what willful and wanton conduct is and you're not making that argument are you? No they were properly instructed on what the standard was. That means that they had to have found that there was a conscious disregard for the safety of others right? That's correct. Okay and why is you say there's it's a play on adverbs or language but if that's the definition of willful and wanton and it was submitted properly to the jury what is your concern about that? Why is that improper I guess is my question. The whole point is that the trial court itself has to serve as a gatekeeper in determining whether to allow this to go to a jury or to undo what a jury does later. Now we believe that this is a sympathetic case as are a lot of these death cases and in fact I'm talking outside the law a jury will ignore I mean I'm just speaking as a trial lawyer a jury will tend to ignore some of the instructions just to reach a desired remedy for a grieving mother as in this case. That's why I think it's important for the trial court to be always cognizant of what the purpose of these immunity statutes are to protect the public first. This is the you know I've been criticized in my brief for talking about how the effect of ignoring these immunity statutes is most keenly felt by people who are disadvantaged and that's true. So we have to keep in mind you know if you want to have swimming pools if you want to have swimming beaches if you want to have public playgrounds ignoring the immunity statutes and allowing cases to go tacitly forward on mere negligence allegations as here then you're going to put all that at risk because the cities won't afford the liability. Does the record reflect whether the beach is still open to the public? It's closed. I believe it I believe that's reflected there somewhere. So the this is the this is why we can't have nice things argument if you will we can't do things to serve the public if we constantly run the risk of being found willfully and wantonly misconduct when it's actually a negligence case and I think that this is the perfect example of a case like that. So continuing the statute itself I'm sorry Justice Turner did I answer your question sufficiently? Yeah you answered it thank you. Thank you. You can't sue a city for mere negligence you have to prove willful and wanton misconduct in order to recover. The statute itself defines willful and wanton conduct as a course of conduct which shows an actual or deliberate intention to cause harm or which if not intentional shows an utter indifference or a conscious disregard for the safety of others or their property. This is not an intentional case so we're at the second phrase of that definition utter indifference to or conscious disregard for safety of others. Now they put on the brief utter giving it the plain meaning of that word means total or absolute so absolute indifference conscious means knowing so you had to you had to know that this was going on that this this young man was drowning and didn't care. That's the standard in plain English that the plaintiff has to prove and that's that's not the they didn't care or the entity did not care that the boy was drowning or is it more accurately the phrase they were indifferent to the things that they might have done to prevent that kind of drowning or to facilitate a much earlier rescue. That could be argued. Thank you uh excuse me counsel along those same lines should there be consideration given to the nature of the activity in this case the city um the beach area and I think this follows with my colleague's question um the nature of any potential dangers in that operation the actions taken. I think it absolutely should I mean we can't take these in isolation we have to look at exactly what's going on uh in terms of what the risks are drowning of which there was no evidence that any drowning had ever occurred at this beach before or do we look at it from you know more closely to the situation uh is the risk that they need to guard against being a 16 year old six foot tall individual consciously going into murky waters up to his neck when he knew he couldn't swim and then engaging in horseplay in that deep area of the lake uh that's that's really the danger that the city's being asked to defend against here not simply drowning uh so I think you have to look at cases like this as a whole from both what the plaintiff is doing and from what uh defendant did to try to prevent this uh either prior to the action or to uh in the search itself and the attempt to rescue on the public policy issue you gave three examples this is why we can't have nice things or if the city wants to provide activities and you mentioned swimming pools playgrounds and lakes um do you think perhaps someone might assess the risk much differently of something like this happening in open water as opposed to an injury on a playground or a uh an incident of a swimmer in trouble in a swimming pool yeah I think they all have their unique set of risks and I think they have to be looked at separately those are just please I would suggest that the risk for open water is greater am I I mean that I can't say that isn't that's not a matter of law unless right but in terms of assessing the risk if I were a municipality I know that if I've got a swimming pool I need lifeguards if I've got open water I'm supposed to have lifeguards that are open water certified now I might not be clear on the facts but most I want to say most of the lifeguards that are involved were not open water certified whatever that there may have been one I'm not quite sure on that but they were all certified but there's my lifeguards I'm not aware of any statute that requires open water certification for a public swimming area you're exactly right I don't think there is any statute okay well you you answer my question thank you okay great and I appreciate that the I think the idea is that you have to do an assessment in reality not in a you know a separate you know in the context of a lawsuit you know what are you what are we doing here to try to safeguard the public are we doing anything are we doing and it's not I don't think it's a matter of doing enough and a matter of fact the case law that I'm will eventually get into we'll talk about it's not a question of could you have done more it's a question of you know did you adequately you know treat this situation and does that rise somehow to the level of an utter indifference and conscious disregard for the safety of others and of course we submit here that it did not so going through some of the for a little clarification you're talking about public policy you seem to be arguing a lack of duty but that's not really what your focus is in your briefs is it it's not lack of duty the duty is is not to injure people willfully and wantonly would be my summation of that it's not a duty not to be negligence it's something much more than that for the public policy reasons of I don't know that this is a duty question the duties conceded that we must not act willfully and wantonly the duty or the I think the question is did the evidence justify going to the jury or a finding of utter indifference and conscious disregard and as I understand I'm sorry justice Turner were you finished yes I am just oh I'm sorry please go ahead counsel and just focusing on that element for a moment the argument that you present to this court is that if I understand it correctly you feel that in evaluating the uncontradicted evidence that the matter should not have gone to the jury is that correct that it was a complete defense as far as all the factual information that was presented and argued at that point so the argument and the focus of your brief today is that there was not sufficient factual disputes to allow the matter to move forward to the jury yes or in not granting the JNOV at the end so it's six of one half it doesn't have another I suppose the city you know what did they do you know as far as preparing for risk such as this you know and this is all recited in the briefs and over and over and again with the various witnesses they provided signage you know don't swim here if you're you know a novice swimmer they provided certified lifeguards you know pre-trained and this gets into the discretionary immunity argument a little bit because you know it's the discretion of the city as to okay we've got a public beach that we can open for the benefit free of charge to the public for a short season of about three months do we build and staff a lifeguard training facility for that or do we rely on certified lifeguards who have been pre-trained pre-certified who know all that good stuff and the discretion of the city in choosing the latter you know I think it's perfectly justifiable but it's still a discretionary act but I digress they called safety meetings and exercises so that's disputed testimony but there was testimony to that effect my notes say anyway that they did have open water lifeguards at least some of them but I think that those were not many compared to the total number if I recall the evidence correctly they put in boy lines to demarcate the deep end from the shallow end they had that signage both on the the diving board or the lifeguard stands outside and they had it in the locker room so you had to walk right by it they provided the guards the necessary safety equipment megaphones whistles float tubes cpr mass backboards etc they provided beach managers had lifeguards to organize and supervise they provided some training efforts even though they were all pre-certified including the running jumping speed test as far as is this lifeguard able to do his or her job and being able to swim to the wall and back in a short amount of time because times are the essence in that situation they actually adopted supervision standards far more stringent than those required by the state of illinois and on and on they're all listed there the the testimony of the lifeguards you know if you want to if we're still being criticized for the way the lifeguards reacted you have dennis caveney who's the the principal guard right at the location uh he was informed uh you know that uh the swimmer was missing where at right here he does his own grid search immediately in his discretion because of time being of the essence you got to get this young man found and out of the water as quickly as possible where is he he's right here okay he did his own grid search rather than waiting to okay i'll blow the whistle and everybody will come running down then we'll leisurely hook our arms together at the shallow end of the pool and begin walking out into the wall no he jumped in and immediately tried to rescue which he testified was uh the eap or emergency action plan for that specific type of a situation using his judgment as a professional lifeguard wasn't the testimony also that he was there was testimony to that effect instead what he did rather than wasting time blowing the whistle was he yelled at his compatriot lifeguard sitting a few feet away in the shallow action uh mr gable if i recall gobble pardon me gobble uh and said what was going on and left it to mr gobble to blow the whistle uh to which there was ample uh testimony of people hearing the with air conditioning on so there's no doubt about that being done i think it's irrelevant who did it as long as it was done does the evidence show how much time passed between that is seen going underwater until the recovery of his body i'm not familiar with anybody having a stopwatch for that situation i recall that there was some testimony but it was varied and i just can't say with any certainty and i don't think anybody had a certain amount of time it was too long for some reason five minutes jumps into my head and todd can correct me on that but um i think that uh i don't think that that was really adequately documented mr mead i i i'm gonna use a comparison and i don't mean to to uh say that the situations are different or too similar but i was at a hotly contested basketball game last night it doesn't take any time at all for a ref to blow a whistle and i'm not really making light of that i'm saying i when you say wasting time blowing a whistle a lifeguard ought to have a whistle readily available and the additional four to six seconds that it takes to lift that whistle and blow it doesn't sound like wasting time to me well perhaps what if in his effort in diving in and trying to find the way and that that in the in the coolness of hindsight i i could tend to agree with you but if the referee in your basketball game were faced with an urgent situation and and had the choice reactively reflexively to blow a whistle or render first aid for example i think you would render first aid uh so yeah it doesn't take time to blow a whistle i would agree with that uh instead he's like i'm going to get in the water as quickly as i can i'm going to yell at my colleague to initiate uh the uh the whistle blowing and gathering the troops on the shore i think that's reasonable but whatever it is it's not willful and wanton uh so my time's running out i want to i'm in passing barb versus cunningham i know that there's an exception in that about known dangers or unknown dangers but i think when we're talking public policy like this uh it's important you know cunningham instituted several safeguards to prevent injuries uh and it shows that at most she took insufficient precautions the fact that she did not take the i like that by lima case which i also cited which i you know talks about you know if you take some action it's not sufficient to be willful and wanton that you didn't do more and i think that that's the situation uh facing us uh are my time being up i would just ask that the judgment be reversed thank you okay thank you mr mead you will have rebuttal mr bresny you may proceed with your argument now please may it please the court mr mead uh thank you uh your honors i i will i do want to correct one thing really quick your honor uh turner you asked if the beach was closed down it was closed down for the remaining of the summer but there was a motion eliminate and i forget we've litigated this case 13 to 15 years now uh if it was the defense or the plaintiff but that beach reopened and there was remedial measures that were done they cleaned up the bottom they took out the diving area so it was reopened for a period of time and then ultimately closed and there's no evidence that it closed because of this drowning or drownings so that you could comb the record but i'm pretty certain on all that um it did never came up it wasn't an issue um and randy can you know agree with me or not on that but that's my recollection i will say that you know i prepared for the bar argument that council made at the end of the close of the case and and in his appellate court he relied very heavily on bar and i noticed that he also uh is i have to say that looking at everything in context with all respect to mr mead but it boils down to a very simple issue here and that is is that the city has a very veiled thinly veiled attempt to simply eradicate the gross negligence and recklessness um from the 3108 exception of willful one that's it i mean time and time again the argument is simply that willful and wanton should only include acts where there is ill intent or motive and intentional harm and that's their argument and that of course is not the law under willful one um the second argument of that is if you if you don't buy that for jnov then you should allow us to make this broad overly broad discretion or immunity uh community to bypass the 3108 exception in this case and and so it really kind of boils down to that the problem with that is that it ignores the kirwin versus lincolnshire and all the other cases including murray which bar heavily relies upon where the supreme court says that there is a wide range of uh intent that is included and going from just mere degrees past negligence all the way up to intentional so clearly ill intent or ill motive isn't uh borne out by the case law or the precedent um the defense advocates that any acknowledgement of safety should be enough to defeat a claim for willful one any acknowledgement not just what they listed but any and again that's not the case bar doesn't stand for that proposition and i agree with the defense when they say bar is not new law the supreme court said that bar is not new law bar did not say that because the teacher had safety protocols in place there was no willful one bar simply said in plain reading of that case that she there was no evidence that she knew serious harm was going to occur from the game because the only issue it decided was the allegation that she committed willful wanton act by not requiring the safety goggles that presented their press that's it so it was the knowledge of harm that that court turned on and it relied very heavily on murray and relied very heavily on hadley and if you if you were to take counsel's argument on bar in this jnob's argument and apply it to murray murray wouldn't exist there'd be absolute immunity because they provided safety mats around the trampoline if you applied it to hadley hadley wouldn't exist because the teacher and hadley told the kids to stop doing a dangerous thing and and he also told all the kids that they should be wearing safety goggles when they work with metal so their tortured analysis of the bar is simply wrong and it's wrong just by looking at the cases that bar relied upon so any safety acknowledgement is not automatically a willful one exception but that's their argument so when we look at this and i really want to talk about murray because murray involves a case of trampolines uh the spotters weren't trained uh there were national standards that applied that weren't followed and they even undertook the analysis of 3108 and 2201 and and and referenced epstein their prior decision long ago that said that 3108 trumps 2201 because of the plain meaning of the statute and its intent of course it does because the intent of the legislature is to make sure that municipalities are not immune from wilf and wanton x but if you allow 2201 to supersede it you got an absolute immunity yet which goes against all the cases decided since 1998 when the immunity exception was passed so what about the knowledge of danger or knowledge of harm in our case was proven and jnov i mean credibility witnesses counsel at one point made an argument in his brief that um the experts canceled out each other that's not that's not true in a jnov analysis as far as i understand um the experts don't cancel each other out but regardless of the experts there was testimony time and time again that lifeguard denotes they have to guard lives that that it was important that through the ymca the star guard the red cross just to name a few the u.s uh life saving association that scanning was surveillance and you needed to do it properly under certain methods that eaps needed to be written down in site specific that pre-service and in-service training needed to be done none of these things were done that eaps needed to be followed they also knew that non-swimmers would always go into the mid area and council said deep deep end and shallow end you'll see digging into the evidence that's not how they referred to it and they didn't refer to it that way because you have 20 30 to 40 000 square feet of open water that has all varying different types of heights from three feet all the way to eight feet and and they were inconsistent and the guards knew this the patrons didn't the buoy line was only at three feet so young kids that were under three feet would have water up to their chest or their neck but in the mid area you could walk two swimming pool lengths towards the outer seawall and still have your head above water and six feet that was the evidence but there were hidden drop that no one knew about and so they knew these things they knew that that testimony by the guards was that that uh the opaque turbid nature of the water justice connect uh raised the risk of drowning they knew this they were trained in this uh they knew and by the way i don't think any of them were certified in open water except for ms young i forget her married name now but she got it the year after this drought that's my recollection i of course rely on the record they came to me the guard who was initially responsible testified the most hazardous dangerous area and this was unrebutted was the diving area so you got the mid area the diving area slide area and he was trying to do both diving and and mid almost every single guard if not all of them testified that the scanning requirements for the diving area were different than open water diving area required a constant continuous surveillance so the kids got up safely got on the board safely went to the end of the board safely went in the water came back up out of the water and got out of the way before the next kid if the next kid was there you had to watch them too that's important because we proved there was no supervision of the mid area at all by katie katie testified he was certified at ymca and he went by the 10 10 scanning rule he had to see everybody in his open area every 10 seconds but then he said for a child to get on the dock and go through that procedure it would take 30 seconds eric drowned saving his brother who was drowning who fell in a drop-off less than 10 feet away from kv's chair to the right katie had to turn to the left and he was watching the diving area that's what he testified now he may have flip-flopped and crossed and recrossed but those that was the testimony and again credibility is not an issue here it's just what the jury likely worked to look at and accept so so what we have here is and that was the digital exhibit that's on a thumb drive that we submitted where our expert a lifeguard uh mr dworkin showed there's no way you could do a 10 10 scan or any scan of the open air mid area and watch the diving area at the same time that's number one that's willful one because they knew they had to do it to do it safely that was the evidence number two uh no whistle was was found now council said yeah they blew the whistle he's right they did and context is key ms young was a head lifeguard she was right behind the slide chair which was just behind the mid-area chair where katie was she was walking on the sand she heard gobble the slide chair guard yell clear the water she didn't hear a whistle and and then he told her we got a report of a missing person but they didn't know where they didn't know when they didn't she didn't see katie they went out to 30 40 000 square feet of water to start dying around the deep water in the diving area after a few minutes she said i think her testimony was three minutes she realized no other guards were coming so she blew her whistle they still didn't come she blew it 15 times to get the guards down to the beach minutes had passed crucial minutes unrebutted six to seven minutes is what time you have to rescue someone who's submerged before they die they know this this is known so when everyone gets down there the head guard says we need to do a line search that's the eap and no one listened eventually a patron got everyone do line search in under three minutes that's how long it took to do the line and to find eric under three minutes that's that's ms young she's a head guard i mean that's the testimony that we have here um not one lifeguard testified that they ever practiced the emergency action plan for missing persons which is what eric was not one life some said that they did other things but everyone admitted never practiced the missing person emergency action plan again these are things taught to them to get their certifications they knew they had to practice in-service training time and time again in eap and they chose not to do they knew they had to scan a certain way they chose not to have more guards they had 10 to 12 guards that day they only allowed two to do the most hazardous dangerous area in the area uh in the facility as well as this very large swath of water two to three swimming pool lengths from the chair all the way to the seawall and over so we get to this i i mean you go to um mr dworkin he says they consciously disregarded the safety of the patrons based on not surveilling properly based on not uh practicing eap based on not blowing the whistle based on not doing everything immediately just uh ms white i'm sorry young testified it had to be done immediately and within seconds and for the cherry on the top ms white said hypothetically no one knew that eric couldn't swim because mr kateny panicked and went to the furthest darkest region of the facility and he didn't tell anybody other than gobble she said if i was told he didn't know how to swim and he was there i'd have sound my whistle we'd have formed a line we'd have found him in under three minutes and that's the case and mr dworkin gave his opinions and he went and talked about what is known in the industry using all these standards so when i when i hear counsel say that there's not enough facts and he brings up my complaint which was never brought up before i have to say if any case showed that there was more than enough knowledge of danger and ordinary carried out being used to prepare for that danger or to respond to that danger it's this case multiple witnesses testified to that um so i go to the next step the 2201 immunity uh we believe it was waived it wasn't brought up initially like counsel said in his brief uh the first appeal was 2015 uh discretionary immunity was never argued um it was never argued post-trial motion there was never a motion for summary judgment on the issue as far as i can remember certainly not before this court now um there wasn't uh it was waived because there was never an objection to any of the evidence based on that on that standard um there wasn't it was waived because they have the burden of proving their firm of defense and yet there's never been an itemization of what actions or acts fall under the discretionary immunity uh no special interrogatory was given to the jury but more importantly it doesn't apply because murray goes through the the language of the statute and i already talked about that so and epstein was the case it relied on as well where it refers to uh 2201 says except as otherwise provided by statute right at the beginning and the tort immunity act is a statute and again that makes perfect logical sense carving out the willful one exception to 308 was meant to make municipalities liable for willful one annex if you allow them to do discretionary and supervision type matters then you run into a slippery hill obviously you just negate the whole exception to the rule um not only that scanning uh following the eap and this was marked and it's an exhibit it was printed it was given to the guards they knew about it they testified about it our ministerial acts not to mention almost every guard said that they were mandatory and they had to be followed that was just the opposite of sam's discretion now now mr meet got a couple of them to say well they could use their good judgment they could do this but they were impeached at the testimonies and their depositions or the prior trial they said that these things were mandatory and again question of fact goes to the jury in a jnov as far as i understand so when i i look at this um i look at this case we've litigated for many years and and i think what else could you do to prove willful one and you look at the cases we cited to and and you go through them and if you take and accept the defendant's argument what bar stands for and you apply it to all those other cases they would all be over they would all be in favor of the defense it's the illogical argument i understand what they want to do and i understand you know we want to make this policy argument but it's the legislature that makes policy and they did in this case they carved out a willful want exception in response to the plea of i believe the appellate court in the late 90s on a drowning case we don't want our lifeguards or our people that take care of us have the opportunity to not be liable at all for just sitting idly by because that's what they could do they could do all that it's gross negligence mere degrees past regular negligence all the way up to intentional and the jury as justice turner you you pointed out were adequately informed we agreed on 14 or 15 itemizations they went to the jury they knew what the law was and they applied the facts and all facts there is more than enough facts about the knowledge of dangers and the responses needed to be done to protect safety of others were ignored all reasonable inferences are in our favor so when council brings up these things like the safety things they did i think it it doesn't address the true nature of willful want analysis it certainly doesn't follow bar and and you look at these things that he's talking about and even with those you have issues of fact there's a photograph mr cavney that day in the chair sitting improperly without a tube and without a whistle there was a photograph taken of the of the signage and and it doesn't say stay on one side of the buoy line if you're not a swimmer or you can't swim it says stay in shallow water for a six-foot person shallow would be chest or neck just like any child in the smaller end and that's exactly what he did all day they were of course playing before michael slipped into the drop-off we have two independent witnesses saying that the guards were just floating sporadically without doing anything for minutes and they had no bone in this case they had to run down and try and help that's there was so much inaction that they were upset that they felt the need to be involved council how many lifeguards were on duty on the day of the drowning the testimony varies uh justice it's between 10 and 12 and the testimony was there's typically between 14 and 15 for an average sunny day which this was in uh were uh put in the guard stations there was a guard station located on the diving platform and he had various testimony about why that was or wasn't used and defendants main witness guernsey hopkins i believe was was her name testified she had always used that station to guard the diving area and then they called an officer blank and i think her name's blank and excuse me she wasn't she's a police officer now for the city uh but she said that she thought it was unsafe but then i had to impeach her with her testimony from years before which she said the only reason why she didn't use it not because she was not licensed lifeguard but because there was goose feces feces on it mr brazil yeah like for you to respond to uh mr mead's argument which i'll kind of paraphrase probably not as articulate as articulate as he did but uh there's 10 or 12 lifeguards there they're certified or at least most of them are there's a buoy line of demarcation between the shallow end and the deep end they have all kinds of equipment they've had some training although not the training that the plaintiff is complaining about here and there's managers well all of this how when the city has done these things does that equate to a conscious disregard for the safety of others it seems like we're talking about negligence here instead of willful and wanton conduct if you have no lifeguards or only three or four lifeguards and you have no buoy line those things that would tend to suggest willful and wanton something above negligence so what's your response to the argument that i've again tried to paraphrase that mr mead presented earlier yes your honor and i appreciate that question i'll tell you that this case follows almost identically to the cases we cited including including the spring court case in murray um you've got standards of care the duty which isn't disputed here is borne out by you know voluntary undertaking but when you have standards that require you to do things to make drownings you know to prevent protect people then those weren't followed and that means the standard care was chosen to be ignored in this case not not supervising the mid area and also not active anger eap or practicing it you know the things that you talk about your honor you know buoy line it didn't divide the deep and the shallow end i already talked about that everything key is in context signage didn't say stay on this item in fact it was number five down under food don't eat food in the water it wasn't even testified that he would have even seen these signs or been able to to discern what they meant having managers having life or certified lifeguards and being relying on them i mean that's just kind of my mind raising the bar as well saying well they've got a piece of paper they're certified that's all we have to do what they did is they adopted the certifications and the policies and procedures that required those certifications and they ignored those things and that's what was proven your honor and that's what i believe the sufficient you're out of time but i have one more question how did plaintiffs prove eric would have survived but for defendant's conduct yeah and and this of course was a one-line argument made in the brief by counsel which wasn't raised on appeal or in the post-trial motion it's a causation argument but i i did mention it earlier judge um there is vast amounts of approximately six to seven minutes okay so being submerged that long that's how long it will take and they vary a little bit between six and seven minutes um they found eric well under three minutes once the line was formed and ms hunter uh is the one that testified that but for them not doing the eap right away they would have found him uh well under three minutes and and that's what went in and of course that was backed up by mr dworkin and some others the line search he was found eight to ten feet from the guard chair once they started the line which only took seconds to form once they got somebody with authority they walked a couple steps and they found him and he was exactly where michael told kv he was and that's katie's testimony he's exactly where michael told him he went under and and that's that's the issue i mean i just you know i mean that's the but for and again i stand on my waiver argument but also i think there's enough facts there that were presented to uh for the jury to reliable okay you are out of time unless justice connect or justice layered has questions no thank you thank you your honors okay uh any rebuttal yeah i don't want to get in too far into the evidentiary weeds but some bold misstatements of the facts have to be countered uh dennis caveney was not panicked i he's a homeland security officer now and i think it's kind of insulting to depict him in that way he was the hero of this operation he was told my brother is right here and he did a grid search himself immediately because he recognized that time was of the essence when that didn't produce him in that very area that he was later found in he said are you sure he's here and he was told and all the lifeguards almost all of them testified and verified this that the compatriots of eric jones and the people on the beach that were also in their party were saying no he's out by the seawall now there's quite a different standard and the evidence will show this between the eaps if an eap is person missing you form a line search and you even have people go look in locker room this is person missing known to be underwater location known and that distinction was brought out and that is you get to him as fast as you can because times of the evidence he's being suffocated and it's more like three minutes that he has to live not five or six if i recall the testimony correctly but we're not here to argue causation i don't want to try this case a third and i'm sure todd doesn't on a factual basis but uh the point is that that they did not sit idly by they did not sit in the chair oh your brother's missing oh too bad hey run and get me a soda will ya it's nothing like that that would be the kind of the type of misconduct uh which would be willful and wanton under the legislature's definition of that term as a utterly you know utterly failing in your purpose consciously disregarding it now that's not us at all this was immediate reaction i want to talk about the the since todd brought it up the pardon me mr breslin brought it up uh the uh the idea that somebody should have been on the uh diving platform uh i think pretty much uniformly the guards testified that that was not a good idea because the diving board itself the way that chair was located and these these properties have been in this condition going back to at least the 1940s from what i've seen in facebook photos uh that the that the diving board itself obscured the lifeguards vision of the area beyond the the board uh so it was more dangerous to guard that area and it was actually safer uh to guard the now look at me the evidence was this the uh if you're guarding that lifeguard the dive bar the diving platform and the mid area you're going to have to move your head that much that's all you have to do to effectively that was what the evidence was to effectively scan that and that's exactly what cave knee was doing and responded appropriately to the situation presented him and then the lifeguards were all misdirected by eric jones's companions oh he's out by the wall i saw bubbles he's out there and so they have to play with the cards they are dealt um there's several other things uh we did not waive discretionary we briefed that and argued that uh justice white's opinion or pardon me rule 23 order from the first appeal uh focused instead on the inappropriate use of evidence by the plaintiff and reversed on that basis so it's not waived at all and there's basically everything we are accused of doing wrong involves discretion and should be totally immune from that basis but more importantly i think if you look back at the the case law and the one involving the gatorade spilled on the floor that i quoted in my brief where the principal had her husband stand by the puddle uh and guard it and a student runs up anyway slips he tries to catch her uh they said no you've tried to do something just like in this case here the fact that you didn't do more cannot seat liability in a case like that it's my time i think it is it's not up yet if you have anything else well i think if you read bar whether or not it's smack on appropriate with this case i think that evidence is the policy considerations uh that are involved in this case and in the other cases same type of a thing we want to protect municipalities from negligence liability therefore we enact this standard and the effect though of the way this case and many others plays out is it ends up reading more like negligence and it's up to the courts to keep those cases from going to verdict your time is now up thank you for your argument also thank you mr breslin for your argument the case is submitted and the court will stand in recess until one o'clock this afternoon